IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SHARPER IMAGE CORPORATION, a Delaware corporation,

        Plaintiff,

   v.

TARGET CORPORATION, a Minnesota corporation, IONIC PRO, LLC, a Delaware corporation, IDEAL PRODUCTS, LLC, a Nevis (offshore) corporation, SYLMARK, INC., a Delaware corporation, SYLMARK, LLC, a Delaware corporation, QWIK COOK, INC. d/b/a HOME TRENDS, a New York corporation, FACTORIES2U, LLC, a California corporation, and CHAIM MARK BESS, an individual,

        Defendants.

_____/

No. C 04-0824 CW

ORDER ADDRESSING CROSS-MOTIONS FOR SUMMARY JUDGMENT

    Defendants Target Corporation, Ionic Pro, LLC, Qwik Cook, Inc. d/b/a Home Trends, Ideal Products, LLC (Ideal Products), Sylmark, Inc. (Sylmark), Sylmark, LLC, Factories2U, LLC and Chaim Mark Bess (collectively, Defendants) move for summary adjudication of Plaintiff Sharper Image Corporation's claims of patent infringement, trade dress infringement and unfair competition and of Defendants' counterclaims for non-infringement of the asserted patents.  Plaintiff opposes the motion, and separately moves to strike portions of it.  Defendants move to strike the opposition.[1]

_____

[1]Both parties' motions to strike are denied; the arguments therein go toward the weight and import of the evidence, and do not provide the Court with any reason to strike the initial filings.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    Plaintiff separately moves to strike, under California Code of

2    Civil Procedure § 425.16, Defendants' tort and State law

3    counterclaims, and in the alternative moves for judgment on the

4    pleadings of the counterclaims, and for partial summary

5    adjudication on its utility patent infringement claim.  Defendants

6    oppose those motions, and purportedly cross-move for summary

7    judgment.[2]  Plaintiff separately moves for leave to file a Third

8    Amended Complaint (TAC) and to join additional defendants.

9    Defendants oppose the motion.

10        These matters were heard on January 27, 2006.  Having

11   considered the papers filed by the parties and oral argument on the

12   motions, the Court grants in part Defendants' motion for summary

13   adjudication of patent and trade dress infringement, as described

14   below.  The Court grants Plaintiff's motion for summary

15   adjudication of Defendants' tort and State law counterclaims.  The

16   Court grants Plaintiff leave to join Mr. Spiegel as a defendant,

17   but otherwise denies the motion for leave to amend.

18                                BACKGROUND

19        Plaintiff is a corporation with its principal place of

20   business in San Francisco, California.  Plaintiff manufactures its

21   own line of consumer products, known as the Sharper Image Design

22   products, which it sells to wholesale and retail customers through

23

24        [2]Plaintiff has filed an "ex parte motion to compel" Defendants
     to withdraw the reply Defendants filed in support of their
25   purported cross-motion.  Defendants oppose the ex parte motion to
     compel.  The Court denies Plaintiff's purported ex parte motion.
26   However, the Court strikes Defendants' reply; because Defendants
     separately filed their own motion for summary judgment, they are
27   not entitled to file an additional cross-motion and reply.

28                                    2

**United States District Court**
For the Northern District of California

1   a multi-channel distribution system.  One of Plaintiff's recent,

2   highly successful products is the Ionic Breeze Quadra (IBQ) air

3   purifier, which purports to clean air without the use of filters,

4   by using wire electrodes to charge airborne particulates, which are

5   then attracted to oppositely-charged plates.

6       Ionic Pro, LLC is the manufacturer of a cheaper, competing

7   filter-less air purifier, the Ionic Pro.  Ideal Products, LLC is a

8   sister company, and shares some employees with Ionic Pro, LLC.

9   Sylmark, LLC is the parent corporation of both Ionic Pro, LLC and

10  Ideal Products, LLC.  Sylmark and Sylmark, LLC (referred to

11  collectively as "the Sylmark entities") share common owners, and

12  both provide services to Ionic Pro, LLC.  Specifically, Sylmark's

13  employees provide customer service support for sales of Ionic Pro.

14  Barry Decl., Ex. G, IP 5767.  Chaim Mark Bess is the former

15  President of Ionic Pro, LLC and former co-President of Sylmark.

16  Proposed defendant Peter Spiegel is the Managing Director of

17  Sylmark, LLC and former Chief Strategic Officer of Ionic Pro, LLC.

18      Defendants Target, Home Trends and Factories2U are retailers

19  of the Ionic Pro.

20      Additional facts are set forth in the discussion section

21  below.

22                         LEGAL STANDARD

23      Summary judgment is properly granted when no genuine and

24  disputed issues of material fact remain, and when, viewing the

25  evidence most favorably to the non-moving party, the movant is

26  clearly entitled to prevail as a matter of law.  Fed. R. Civ. P.

27  56; Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986);

28                              3

**United States District Court**
For the Northern District of California

<u>Eisenberg v. Ins. Co. of N. Am.</u>, 815 F.2d 1285, 1288-89 (9th Cir. 1987).

The moving party bears the burden of showing that there is no material factual dispute.  Therefore, the court must regard as true the opposing party's evidence, if supported by affidavits or other evidentiary material.  <u>Celotex</u>, 477 U.S. at 324; <u>Eisenberg</u>, 815 F.2d at 1289.  The court must draw all reasonable inferences in favor of the party against whom summary judgment is sought. <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986); <u>Intel Corp. v. Hartford Accident & Indem. Co.</u>, 952 F.2d 1551, 1558 (9th Cir. 1991).

Material facts which would preclude entry of summary judgment are those which, under applicable substantive law, may affect the outcome of the case.  The substantive law will identify which facts are material.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).

Where the moving party does not bear the burden of proof on an issue at trial, the moving party may discharge its burden of production by either of two methods.  <u>Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.</u>, 210 F.3d 1099, 1106 (9th Cir. 2000).

> The moving party may produce evidence negating an essential element of the nonmoving party's case, or, after suitable discovery, the moving party may show that the nonmoving party does not have enough evidence of an essential element of its claim or defense to carry its ultimate burden of persuasion at trial.

<u>Id.</u>

If the moving party discharges its burden by showing an

4

**United States District Court**
For the Northern District of California

absence of evidence to support an essential element of a claim or defense, it is not required to produce evidence showing the absence of a material fact on such issues, or to support its motion with evidence negating the non-moving party's claim.  Id.; see also Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 885 (1990); Bhan v. NME Hosps., Inc., 929 F.2d 1404, 1409 (9th Cir. 1991).  If the moving party shows an absence of evidence to support the non-moving party's case, the burden then shifts to the non-moving party to produce "specific evidence, through affidavits or admissible discovery material, to show that the dispute exists."  Bhan, 929 F.2d at 1409.

If the moving party discharges its burden by negating an essential element of the non-moving party's claim or defense, it must produce affirmative evidence of such negation.  Nissan, 210 F.3d at 1105.  If the moving party produces such evidence, the burden then shifts to the non-moving party to produce specific evidence to show that a dispute of material fact exists.  Id.

If the moving party does not meet its initial burden of production by either method, the non-moving party is under no obligation to offer any evidence in support of its opposition.  Id. This is true even though the non-moving party bears the ultimate burden of persuasion at trial.  Id. at 1107.

Where the moving party bears the burden of proof on an issue at trial, it must, in order to discharge its burden of showing that no genuine issue of material fact remains, make a prima facie showing in support of its position on that issue.  UA Local 343 v. Nor-Cal Plumbing, Inc., 48 F.3d 1465, 1471 (9th Cir. 1994).  That

5

is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue.  Id.; see also Int'l Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1264-65 (5th Cir. 1991).  Once it has done so, the non-moving party must set forth specific facts controverting the moving party's prima facie case.  UA Local 343, 48 F.3d at 1471.  The non-moving party's "burden of contradicting [the moving party's] evidence is not negligible."  Id.  This standard does not change merely because resolution of the relevant issue is "highly fact specific."  Id.

DISCUSSION

I.  Infringement of '484 (Utility) Patent

Defendants move for summary adjudication of non-infringement of the '484 patent.  Plaintiff has affirmed that it does not allege that Defendants' second-generation Ionic Pro infringes the '484 patent, and covenants not to sue Defendants for such infringement. Barry Decl. ¶ 8.  Accordingly, the Court grants Defendants' motion for summary adjudication of non-infringement and dismisses with prejudice any '484 patent infringement claims based on the second-generation Ionic Pro.  With respect to the first-generation Ionic Pro, however, Plaintiff opposes Defendants' motion for summary adjudication, and separately moves for summary adjudication of its claim of infringement of the '484 patent.

A.  Factual Background

Plaintiff is the assignee of U.S. Patent No. 6,709,484 (the '484 patent), issued on March 23, 2004.  The '484 patent's asserted claims pertain to a method for cleaning the emitter electrodes of an "electro-kinetic electro-static air conditioner."  Of the

6

United States District Court

For the Northern District of California

asserted claims, only Claim 29 and 32 are independent. Claim 29 discloses,

> A method for cleaning an emitter electrode with an electrode cleaning mechanism, . . . the method comprising:
> (a) rotating the housing from the upright position so that the electrode cleaning mechanism travels, from an initial position, along the emitter electrode and frictionally removes debris from the emitter electrode; and
> (b) rotating the housing generally back to the upright position so that the electrode cleaning mechanism travels back to the initial position.

'484 patent 18:66-19:10. Claim 32 is the same except that it discloses "generally inverting" the housing instead of "rotating" the housing. Id. at 20:4-10.

Plaintiff accuses Defendants of infringing the '484 patent due to their recommended method of cleaning the first-generation of the Ionic Pro. Sylmark was responsible for designing the Ionic Pro Owner's Guide. Barry Decl., Ex. K, IP-2287. The Owners' Guide distributed with the first-generation Ionic Pro recommended that users clean the "internal ionizing wires" "after every eight to ten days of use or whenever you hear excessive noise." Barry Decl., Ex. E, Owner's Guide at 9. In order to do so, the Owners' Guide instructed users to "tilt the unit upside down for a few seconds and then right side up again to allow the internal wire cleaner to work." Inverting the Ionic Pro caused a cleaning plate to slide along the wire emitter electrodes. Spiegel Decl. ¶ 7. Mr. Spiegel also specifically recommended in an email that Wal-Mart should clean the first-generation Ionic Pro units by rotating them upside down. Barry Decl., Ex. H, IP 8584.

According to Mr. Spiegel, early feedback from sales of the

United States District Court

For the Northern District of California

first-generation Ionic Pro "indicated that consumers either did not read the instructions for inverting the purifier to clean the emitter electrodes, or that they were unwilling to go to the trouble of physically lifting and inverting the Pro just to clean the emitter electrodes." Spiegel Decl. ¶ 8.  In order to overcome this consumer resistence, Ionic Pro, LLC developed a second-generation product with a "new cleaning mechanism that works without physically inverting the air purifier." Spiegel Decl. ¶ 9. Internal company emails suggest an additional motivation for the new design, however.  Plaintiff had already brought its patent infringement charges, and in a May 26, 2004 email, Paul Shellhammer reported that Ionic Pro, LLC had "turned both Patent challenges into positive changes."  Barry Decl., Ex. G, IP 11037, May 26, 2004 Email from Paul Shellhammer to Yu Shen.  The new mechanism is described and claimed in U.S. Patent No. 6,855,190 (the '190 patent), of which Sylmark Holdings, Ltd. is the assignee.  The application for this patent was filed on April 12, 2004, and the PTO issued it on February 15, 2005.

Manufacturing of the first-generation Ionic Pro ceased in early February, 2004.  Spiegel Decl. ¶ 7.  However, as Defendants conceded at the hearing, Ionic Pro, LLC continued to ship its first-generation product after the '484 patent was issued.  Between February and June, 2004, Mr. Spiegel admits that orders were filled from the existing inventory of first-generation products.  Barry Decl., Ex. B, Spiegel Dep. 249:15-17.  In April, 2004, Sylmark employees insured that manuals accompanied Ionic Pro units.  Barry Decl., Ex. B, IP 8414.  A May 13, 2004 email exchange among Sylmark

8

employees shows that the Ionic Pro continued to be advertised after the '484 patent issued. <u>See</u> Barry Decl., Ex. G, IP 5758 Email from Joel Chamberlain to Rick Shiu (noting Ionic Pro advertisement and offering product for sale). A June 23, 2004 email from a Sylmark employee stated that the company "only started making [second-generation Ionic Pros] a week ago." Barry Decl., Ex. L.

Plaintiff identifies evidence of two Ionic Pro users who directly infringed the asserted method claims after the patent issued.[3] On August 29, 2004, an Ionic Pro customer wrote the manufacturer to say that she noticed "when I turn the unit upside down I have to really shake it to make whatever slides up and down move. I'm sure it's gummy inside" due to her smoking. Barry Decl., Ex. H, Email from Marlaine to Inbox. On June 7, 2004, another Ionic Pro customer wrote to complain that the red light kept going on, explaining, "The first couple of times this happened we cleaned everything as per the instruction, even though the blades were not dirty." <u>Id.</u>, Email from Cheryl Welsh-Carrier to Inbox. Defendants object to use of these customers' emails to prove direct infringement on the grounds that they are not authenticated. This objection is sustained, and the Court does not consider the consumer statements for the truth of the matters asserted therein.

On July 26, 2004, Plaintiffs' counsel ordered two Ionic Pro air purifiers, one first-generation and one second-generation, from

---

[3]A user also submitted a review to Amazon.com on March 21, 2004, two days before the '484 patent issued, including the statement "cleaning is very easy." Barry Decl., Ex. H, IP 12322.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

Target.  The first-generation product arrived just two days later.
Barry Decl. ¶ 15.  The second-generation version was not delivered
until October, 2004.  Id. ¶ 7.  Factories 2U sold several Ionic
Pros in late August and early September, but the sales records do
not indicate that these were first-generation products.  Barry
Decl., Ex. I, Factories 2U, LLC, Sales by Item Detail, January
through December 2004.  There is no evidence showing that any of
these products was accompanied by an Owners' Manual.

On August 23, 2004, in connection with Plaintiff's motion for
a preliminary injunction, Mr. Spiegel declared to the Court that he
believed that all Ionic Pro units being sold at that time by his
company or other Defendants were second-generation products.
August 23, 2004 Spiegel Decl.  However, he acknowledged in his
deposition that other retailers may have been continuing to sell
first-generation Ionic Pros at that time.  Spiegel Dep. 252:14.

The parties dispute which entities and individuals
participated in selling or offering for sale the first-generation
Ionic Pro.  The purpose of Ideal Products is to "open up the retail
trade for the infomercial products, the wholesale trade, in other
words, to sell to mass merchandisers, the carriage trade, that
group."  Barry Decl., Ex. C, McConnell Dep. 21:19-22.  As evidence
that Ideal Products sold the Ionic Pro product, Plaintiff points to
the testimony of Andrew Parker, Senior Vice President for Sharper
Image Design, and Estelle Cohen, former CFO for Sylmark.  Mr.
Parker states that in February, 2004, he saw the Ionic Pro product
for sale in a booth rented by Ideal Products.  Parker Decl. ¶ 6.
Ms. Cohen testified, "If Ideal Products sold" Ionic Pro products,

United States District Court

For the Northern District of California

"then it would be reflected on the Ideal Products' financial statements." Barry Decl., Ex. U., Cohen Dep. 215:20-22. Plaintiff notes that Defendants produced a 2004 projected sales chart for the Ionic Pro labeled, "Ideal Product, L.L.C. Ionic Pro." Barry Decl., Ex. XX. Mr. Shellhammer, its author, testified that he mistakenly labeled the sales chart using an Ideal Products template and neglected to change the name. Shellhammer Reply Decl. ¶ 3.

Plaintiff also accuses Mr. Bess, who served as president of Ionic Pro, LLC until June, 2005 and holds a minority interest in its parent company. He testified that, other than his formal duties as a company officer, he had "almost no involvement" with the Ionic Pro, which was developed and managed by Mr. Spiegel. Rosenblatt Decl., Ex. M., Bess Dep. 104-05. Mr. Bess did attend a meeting with outside counsel in which it was decided that a disclaimer would be added to the Ionic Pro box stating that it was not a Sharper Image product. Barry Decl., Ex. TT, Bess Dep. 19:18-20:12. He also participated in a sales meeting with prospective retailer Wal-Mart in September, 2004. Barry Decl., Ex. UU, IP 9098-9100. Also in September, 2004, Mr. Bess was included in an email exchange in which he stated that he would "steal a container [of Ionic Pros] at the factory for Harriet Carter (1100). They have almost 500 backorders, and may put us on the front cover for Christmas if we can solve this problem." Id. at IP 9144. Finally, at an unspecified time, Mr. Bess was involved in analyzing the effectiveness of an Ionic Pro advertisement that ran in USA Today. Barry Decl., Ex. WW, 45, 51.

1

2        B.   Applicable Law

3        Title 35 U.S.C. § 271(b) provides, "Whoever actively induces
infringement of a patent shall be liable as an infringer."  Absent
direct infringement, there can be no inducement of infringement.
Met-Coil Sys. Corp. v. Korners Unlimited, Inc., 803 F.2d 684, 687
(Fed. Cir. 1986) (citing Stukenborg v. Teledyne, Inc., 441 F.2d
1069, 1072 (9th Cir. 1971)).  Circumstantial evidence is sufficient
to establish direct infringement and inducing infringement, and
"may also be more certain, satisfying and persuasive than direct
evidence." Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261,
1272 (Fed. Cir. 1986) (quoting Michalic v. Cleveland Tankers, Inc.,
364 U.S. 325, 330 (1960)).  In Arthrocare Corp. v. Smith & Nephew,
Inc., 406 F.3d 1365, 1377 (Fed. Cir. 2005), the court found "strong
circumstantial evidence" that users directly infringed a patent,
including both testimony regarding the intended infringing design
and sales literature instructing customers to follow an accused
method.  See also Golden Blount v. Robert H. Peterson Co., 438 F.3d
1354 (Fed. Cir. 2006) (finding direct infringement could be
inferred from evidence of sales of unassembled product with
instructions to users for creating infringing configuration).

        Intent is also a required element of induced infringement.  To
be liable for inducing infringement, the alleged infringer "must be
shown . . . to have knowingly induced infringement." Manville
Sales Corp. v. Paramount Sys., Inc., 917 F.2d 544, 553 (Fed. Cir.
1990) (emphasis in original).

        As a general rule, "inducement of infringement under § 271(b)
does not lie when the acts of inducement occurred before there

12

United States District Court

For the Northern District of California

1  existed a patent to be infringed." Nat'l Presto Indus., Inc. v. W.

2  Bend Co., 76 F.3d 1185, 1196 (Fed. Cir. 1996).

3      C.  Analysis

4          1.  Ionic Pro, LLC and Sylmark Entities

5      With respect to Defendants Ionic Pro, LLC and the Sylmark

6  entities, neither Plaintiff nor Defendants are entitled to summary

7  judgment on the issue of inducement of infringement.  Defendants do

8  not deny that a user who followed the cleaning instructions

9  accompanying the first-generation Ionic Pro would directly infringe

10 once the '484 patent was issued.  Defendants nevertheless contend

11 that they cannot be liable for inducing infringement because

12 Plaintiff has introduced no evidence that any Ionic Pro users

13 indeed directly infringed.

14     In Moleculon Research, the plaintiff met its burden of showing

15 infringement of a puzzle method claim under § 271(b) by showing

16 "circumstantial evidence of extensive puzzle sales, dissemination

17 of an instruction sheet teaching the method of restoring the

18 preselected pattern with each puzzle, and the availability of a

19 solution booklet on how to solve the puzzle."  793 F.2d at 1272.

20 Here, there is similar circumstantial evidence that Ionic Pro users

21 infringed after the patent was issued:  the Owner's Guide

22 instructed users to invert the product to clean the wires, which

23 provides circumstantial evidence that those who followed the

24 product instructions infringed the '484 patent.  The market

25 research showing that consumers were unwilling to clean the first-

26 generation Ionic Pro by inverting it is evidence that some, and

27 possibly many, consumers did not infringe.  Based on the evidence,

28                                    13

however, a reasonable trier of fact could also draw the inference that at least some customers did follow the instructions. Therefore, the Court finds that a disputed issue of material fact exists as to whether Ionic Pro users directly infringed the asserted claims of the '484 utility patent.

Defendants also contend that, in the time period after the patent issued, no evidence shows that they acted with the necessary intent to be held liable for inducement.  With respect to Ionic Pro, LLC and Sylmark, the evidence contradicts Defendants' assertions.  These entities undisputedly learned of the '484 patent when Plaintiff filed suit.  Sales records show that Ionic Pro, LLC continued to sell what Mr. Spiegel admits was first-generation product for months after the '484 patent was issued.  After the '484 patent was issued, but before the second-generation product was available, Sylmark employees advertised the product for sale and insured that instruction manuals were included with the product.  Therefore, those sales of first-generation product, in combination with the instruction manuals designed in part by Sylmark, are some evidence of a knowing intent to induce infringement.  Disputed issues of fact thus preclude summary adjudication of Plaintiff's utility patent infringement claims against Ionic Pro LLC and the Sylmark entities.

With respect to the retail Defendants, however, Plaintiff has not identified evidence of intent sufficient to withstand summary judgment.  There is no evidence that Factories 2U, Target or Qwik Cook knowingly sold the instruction manual with first-generation products after they were made aware of Plaintiff's claims of

United States District Court

For the Northern District of California

infringement.   For this reason, Court denies Plaintiff's motion for
summary judgment of infringement of the '484 patent by Defendants
Factories 2U, Target and Qwik Cook, and grants Defendants' motion
for summary adjudication with respect to these retailers.

2.   Ideal Products

Defendants move for summary adjudication of Plaintiff's claims
against Defendant Ideal Products, on the grounds that there is no
evidence that Ideal Products was involved in the sale or
manufacture of the Ionic Pro.

Neither Mr. Parker's nor Ms. Cohen's testimony is direct
evidence that Ideal Products sold the Ionic Pro at a time when
doing so could constitute inducement of infringement of the '484
utility patent, i.e. after March 23, 2004.   Mr. Parker says only
that he observed the Ionic Pro in an Ideal Products sales booth in
February, 2004.   Ms. Cohen had left the company by the time the
'484 patent was issued.   Nevertheless, Mr. Parker's testimony is
evidence that Ideal Products at some point sold the Ionic Pro or
offered it for sale.   Because Ideal Products' admitted purpose is
to promote the trade of Sylmark products such as the Ionic Pro, Mr.
Parker and Ms. Cohen's testimony would allow the trier of fact to
draw a reasonable inference that Ideal Products continued to offer
to sell the Ionic Pro after the March 23 patent issue date.   For
this reason, the Court denies Defendants' motion for summary
adjudication with respect to Ideal Products.

3.   Chaim Mark Bess

Defendants move for summary adjudication of Plaintiff's claims
against Mr. Bess, on the grounds that he lacks sufficient

15

involvement with Ionic Pro to be held liable for any of Plaintiff's claims against him.

Plaintiff claims that the Court should "pierce the corporate veil" and hold Mr. Bess liable under the alter ego theory.   The Court may pierce the corporate veil only where the following two conditions are met:   "(1) there is such a unity of interest and ownership that the individuality, or separateness, of the said person and corporation has ceased, and (2) an adherence to the fiction of the separate existence of the corporation would sanction a fraud or promote injustice."   SEC v. Hickey, 322 F.3d 1123, 1128 (9th Cir. 2003) (citations and quotation marks omitted).

Plaintiff has failed to show any evidence to justify piercing the corporate veil.   Plaintiff's allegations of deceit are directed generally toward "Mr. Bess and his associates," and therefore do not show that the separateness between Mr. Bess, specifically, and the Defendant corporations had ceased.   Accordingly, it is not appropriate to pierce the corporate veil and hold Mr. Bess liable for all of his company's actions.

Plaintiff has also failed to raise a dispute of fact regarding the question of whether Mr. Bess personally should be held liable for inducement of infringement.   Although the evidence shows that Mr. Bess understated his own involvement in the development and marketing of the Ionic Pro, it does not show that Mr. Bess was actively involved in developing and marketing the first-generation Ionic Pro, with the knowledge that this would induce the infringing acts, after the issuance of the '484 patent.

Therefore, the Court grants Defendants' motion for summary

16

United States District Court

For the Northern District of California

1  adjudication of Mr. Bess' liability for infringement.

2  II.   Infringement of '494 (Design) Patent

3      Defendants move for summary adjudication of non-infringement

4  of the '494 design patent.

5      A.   Factual Background

6      Plaintiff is also the assignee of U.S. Design Patent No.

7  433,494 (the '494 patent).   The '494 patent was issued on November

8  7, 2000 and claims an ornamental design for an air purifier.

9      Tristan Christianson, a co-inventor of the patent and

10  Plaintiff's Rule 30(b)(6) designee on the topics of the design and

11  selection of trade dress for IBQ, testified that there were only

12  three aspects of the design that "did not arise from functional

13  need":  the scalloped cut-outs on either side of the body, the

14  curved button below the handle and the handle itself.  Rosenblatt

15  Decl., Ex. AA, Christianson Dep. 198:2-10.   In prior briefing

16  before this Court, however, Mr. Christianson had explained that,

17  viewing the '494 patent as a whole, the following features were

18  part of the claimed ornamental design:  "an overall tower-shape,

19  size, shape and configuration (see Figures 1 through 6); (b) an

20  oval cross-section; (c) a circular base, which is not flush with

21  the bottom of the air cleaner's housing; (d) numerous

22  (approximately 50) sleek, smooth horizontal inlet and outlet vents

23  located along the front and back of the air purifier's tower that

24  are interrupted by a vertical seam; and (e) operational controls

25  that are situated at the top of the housing, which is slightly

26  sloped downward."  Docket No. 60, May 18, 2004 Declaration of

27  Tristan Christianson.

28                                    17

United States District Court
For the Northern District of California

Andrew J. Parker, Senior Vice President of Sharper Image Design, declares that the following features of the IBQ are "ornamental in nature and selected to create a visually attractive product": the rounded tower shape; the downward slant of the top and upper surface; the clean design lines of the top surface, including the recessed handle; the cross-sectional shape creating a narrow, tapered impression; the horizontal orientation and arrangement of the vents; the wrapping around to the sides of the vents; the narrow, vertical airflow band; and the vertical band separating front vents from the rear vents. Parker Decl. ¶¶ 3-11. Mr. Parker identifies other competitors' air purifiers that do not include some of those features; for instance, Duracraft air purifiers are short and boxy. Id. ¶ 4.

B.   Applicable Law and Analysis

Determining whether a design patent is infringed requires (1) construction of the patent claim and (2) comparison of the construed claim to the accused product. Elmer v. ICC Fabricating, Inc., 67 F.3d 1571, 1577 (Fed. Cir. 1995).

1.   Construction of the '494 Patent

"In construing a design patent claim, the scope of the claimed design encompasses 'its visual appearance as a whole,' and in particular 'the visual impression it creates.'" Contessa Food Prods., Inc., v. Conagra, Inc., 282 F.3d 1370, 1376 (Fed. Cir. 2002) (citing Durling v. Spectrum Furniture Co., 101 F.3d 100, 104-05 (Fed. Cir. 1996)). If the design contains both functional and non-functional elements, then "the scope of the claim must be construed in order to identify the non-functional aspects of the

18

design." OddzOn Prods., Inc. v. Just Toys, Inc., 122 F.3d 1396,

1405 (Fed. Cir. 1997) (citing Lee v. Dayton-Hudson Corp., 838 F.2d

1186, 1188 (Fed. Cir. 1988)).  However, the fact that a particular

feature of a design performs a function does not mean that the

feature cannot be part of a claimed design; as the Federal Circuit

has explained in relation to a dispute over a design patent for

shoes,

> There is no dispute that shoes are functional and that certain
> features of the shoe designs in issue perform functions.
> However, a distinction exists between the functionality of an
> article or features thereof and the functionality of the
> particular design of such article or features thereof that
> perform a function.  Were that not true, it would not be
> possible to obtain a design patent on a utilitarian article of
> manufacture, or to obtain both design and utility patents on
> the same article.

Avia Group Int'l, Inc., v. L.A. Gear Cal., Inc., 853 F.2d 1557,

1563 (Fed. Cir. 1988).

Defendants urge the Court to adopt a construction of the

design patent based only on those aspects of the design which Mr.

Christianson testified did not arise from functional need,

specifically the scalloped cut-outs on the sides, the crescent-

shaped curved button below the handle and the recessed handle

itself.[4]  Plaintiff, on the other hand, asks the Court to rely

_____

[4]Plaintiff moves to strike the portions of Defendants' motion
which rely on Mr. Christianson's testimony for the purpose of
construing the '494 patent's claim, arguing that such extrinsic,
inventor testimony cannot be considered.  Plaintiff's motion to
strike is denied.  While Mr. Christianson's testimony is not, in
itself, evidence of the proper construction of the claim, it is
relevant to the Court's determination of which features are

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

exclusively on the declaration of Mr. Parker and his much broader view of the design's ornamental features in order to determine the scope of the patented design.

The Court finds that all of the features identified by the declarants are significant parts of the "overall visual impression" given by the patented design.  Mr. Christianson's and Mr. Parker's testimony is not necessarily inconsistent.  The fact that some of the features described by Mr. Parker provide the IBQ with functional as well as aesthetic advantages (and thus were not listed as "purely" ornamental by Mr. Christianson) does not mean that those features are purely functional.  Furthermore, the three ornamental attributes specifically identified by Mr. Christianson, considered in isolation, do not encompass, as the construction of a design patent must, an overall visual impression of the design (which Mr. Christianson himself testifies to be a "sleeker, more sculptured appearance").  Christianson Dep. 199:2-3.  On the other hand, those distinctive, purely ornamental features identified by Mr. Christianson are also part of the design's overall visual

_____

ornamental in nature and which are functional, an inquiry which must precede construction of claimed design and which is not answered by the patent itself.  See Key Pharms. v. Hercon Labs. Corp., 161 F.3d 709, 716-17 (Fed. Cir. 1998) (noting that district courts properly consider extrinsic evidence to resolve questions in claim construction not answered by the intrinsic evidence of the patent and its file history).  Mr. Christianson's testimony is consistent with the intrinsic evidence of the patent itself; all of the ornamental features he identifies are clearly visible in the patent drawings.

impression.

Therefore, the Court gives the following claim construction to the '494 patent.  The '494 patent is directed toward an ornamental design for a tower-type air purifier.  The housing has a narrow and tall shape with an oval cross-section, as shown in Figure 1, fixed on top of a circular base which is bigger than the bottom of the housing, see Fig. 2.  Figures 1, 2 and 5 show many horizontal vents which are located along the front and back of the tower, separated by scalloped cut-outs on either side of its body.  A crescent-shaped control button is located on top of the unit, below the handle.  Figures 1 and 7.  As seen from the perspective of Figures 5 and 6, the top of the unit is slanted downward.  A boomerang-shaped handle (see Fig. 7) is located in a recessed cavity and protrudes up from the top.  See Figs. 5 and 6.

2.  Comparison

The trier of fact need not find that the patented and accused designs are identical in order to find design patent infringement.  Braun Inc. v. Dynamics Corp. of Am., 975 F.2d 815, 820 (Fed. Cir. 1992).  Comparison of the accused product "includes two distinct tests, both of which must be satisfied in order to find infringement:  (a) the 'ordinary observer' test, and (b) the 'point of novelty' test."  Contessa Food Prods., Inc., v. Conagra, Inc., 282 F.3d 1370, 1377 (Fed. Cir. 2002).  Because the Court finds that Plaintiff has failed to raise a disputed issue of material fact

21

under the point of novelty test, it need not decide whether the Ionic Pro infringes under the ordinary observer test.

The point of novelty test requires that the accused product "contain substantially the same points of novelty that distinguished the patented design from the prior art." <u>Goodyear Tire & Rubber Co. v. Hercules Tire & Rubber Co., Inc.</u>, 162 F.3d 1113, 1118 (Fed. Cir. 1998) (citing <u>L.A. Gear, Inc., v. Thom McAn Shoe Co.</u>, 988 F.2d 1117, 1125 (Fed. Cir. 1993)). The purpose of the point of novelty test is to focus only on those aspects of a design which render it different from prior art designs. <u>Winner Int'l Corp. v. Wolo Mfg. Corp.</u>, 905 F.2d 375, 376 (Fed. Cir. 1990), <u>overruled on other grounds</u> by <u>Cardinal Chem. Co., v. Morton Int'l</u>, 508 U.S. 83, 92 n.12 (1993), (citing <u>Litton Sys., Inc., v. Whirlpool Corp.</u>, 728 F.2d 1423, 1444 (Fed. Cir. 1984)).

Plaintiff objects to Defendants' use of prior art not cited by Plaintiff to the PTO during prosecution, specifically U.S. Patent No. Des. 389,567 (the Gudefin patent) and U.S. Patent No. Des. 375,546 (the Lee patent), in order to establish the '494 patent's points of novelty. Plaintiff relies on <u>Bernhardt, LLC v. Collezione Europa USA, Inc.</u>, in which the Federal Circuit held that to satisfy the points of novelty test in a design patent infringement case, the patentee must "at minimum" introduce as evidence "the design patent at issue, its prosecution history, and the relevant prior art references cited in the prosecution

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

history."  386 F.3d 1371, 1384 (Fed. Cir. 2004).  However, nothing in Bernhardt suggests that prior art not cited during prosecution may not also be considered in determining which aspects of a design are novel.

Plaintiff also argues that design patent features are points of novelty if the particular combination of features is not found in the prior art.  Plaintiff relies on an overly-broad interpretation of Rubbermaid Commercial Prods., Inc., v. Contico Int'l, Inc., 836 F.Supp. 1247, 1259 (W.D. Va. 1993), where the court stated (in the context of a challenge to a design patent's validity, not infringement), that the overall arrangement of individual elements could be considered a point of novelty.  The Rubbermaid court's approach has since been abrogated by the Federal Circuit's decision in Lawman Armor Corp. v. Winner Int'l, LLC, 437 F.3d 1383 (Fed. Cir. 2006) that a new combination of elements shown in the prior art could not, in itself, constitute a "point of novelty" in the new design.[5]

Plaintiff fails to identify points of novelty in light of the uncited prior art Gudefin and Lee patents.  Of the elements of the claimed design, as construed by the Court, virtually none of those proffered by Plaintiff as points of novelty are, in fact, new.  The

_____

[5]After the hearing on their motions, both parties submitted short supplemental briefs addressing the Federal Circuit's recent holding in Lawman.

Lee design shows a round cross-section with horizontal vents that wrap around both the front and back of the housing.  The Gudefin design shows a narrow and tall housing shape, fixed on top of a circular base which is bigger than the bottom of the housing, with many vents located on the front and back of the unit, separated on the sides by solid portions with no vents.  The Gudefin design also places the controls on the top of the unit, and the top of the unit angles downward.  <u>See</u> Gudefin Patent Figs. 3 and 5.  Thus, only the following elements of the '494 patented design, as construed by the Court, remain as potential points of novelty:  the oval cross-section; the scalloped cut-outs separating the vents on either side of the body; the crescent-shaped control button; and the boomerang-shaped handle located in a recessed cavity and protruding from the top.  Of these, the only element arguably shared by the Ionic Pro is the placement of the handle in a recessed cavity.  Otherwise, the Ionic Pro does not share the IBQ's points of novelty:  its cross-section (rounded like Gudefin's) is guitar-pick rather than oval-shaped; its vents are separated by a narrow, solid seam rather than scalloped cut-outs; its control button is round; and its handle is formed by two round holes, which do not protrude from the top.

    The Court finds that Plaintiff has failed to introduce a triable issue of material fact under the required point of novelty test.  Accordingly, the Court grants Defendants' motion for summary

United States District Court

For the Northern District of California

adjudication of Plaintiff's claim of design patent infringement.

III.   Trade Dress Infringement

Defendants also move for summary adjudication of Plaintiff's claim of trade dress infringement.

A.   Factual Background

Plaintiff claims that its trade dress consists of the combined use of the following five elements:  (1) upright, rounded tower shape; (2) number, arrangement and design of its sleek, smooth, horizontal wrap-around vents; (3) slanted top; (4) placement and design of the handle for the removable collector grid; and (5) design, placement and designation of the operational controls.

According to Jeffrey Forgan, a Sharper Image CFO, Plaintiff has conducted an "extensive advertising and marketing campaign" for the IBQ using its trade dress.  Forgan Decl. ¶ 3.  The IBQ is featured prominently in every Sharper Image catalog, a publication into which Plaintiff puts substantial resources.  Id. ¶ 6. Plaintiff has spent huge amounts of money advertising the IBQ in newspapers, magazines and informercials.  Id. ¶¶ 8-9.  The IBQ has also received unsolicited media coverage, including appearances in two popular television shows.  Id. ¶ 11.  Defendants' and other competitors' advertisements and infomercials have featured the IBQ without identifying it by name.  Id. ¶ 12.

Before the release of the Ionic Pro, an employee in Sylmark's

United States District Court

For the Northern District of California

product development office ordered two IBQ air purifiers, explaining that these were "needed for China," where Ionic Pros were being manufactured.  Barry Decl., Ex. G, IP 5661.  As Plaintiff suggests, a reasonable inference is that Defendants used those IBQs to assist in manufacturing.  Other internal Sylmark emails show that Ionic Pro manufacturers imitated the internal working of the IBQ.  See, e.g., id. at IP 10306 (noting that, although Ionic Pro has three wires and IBQ has two, both products produced the "same result" and used the "same metal piece").  Ms. Cohen testified that, in her personal opinion, the Ionic Pro product "was meant to have the same look and feel and same functionality as The Sharper Image product."  Barry Decl., Ex. U, Cohen Dep. 70:16-18.  Plaintiff also notes that Defendants used the same or similar marketing techniques such as offering free shipping.

Plaintiff's expert, Walter McCullough, conducted consumer research showing a twenty-one percent level of "design related confusion" between the IBQ and Ionic Pro products.  McCullough Decl., Ex. A, Report on a Test of Source Confusion for the Sharper Image Ionic Breeze Quadra Air Purifier.  In addition to comparing consumer reactions to the IBQ and Ionic Pro air purifiers, Mr. McCullough also did a comparison between the IBQ and the Trion Rx, another vented, tower air purifier of the same color that is less similar in shape to the IBQ than is the Ionic Pro.  The results of

United States District Court

For the Northern District of California

the survey showed that three percent of consumers were confused about the source of the Trion Rx, twenty-four percent were confused about the source of the Ionic Pro, and thus twenty-one percent were confused by the similarity in appearance between IBQ and Ionic Pro, specifically.

Both parties have been contacted on several occasions by consumers confused about the source of the Ionic Pro.  For instance, one consumer wrote to Sylmark to complain, "i did not realize that the ionic pro was not part of the sharper image co. that was due to my own fault i have not used this and would like to know about returning costs etc [sic]."  Barry Decl., Ex. A, IP 14192.  An internal memorandum from Mr. Spiegel provided Ionic Pro, LLC sales staff and Sylmark customer service employees with answers to questions regarding the Ionic Pro and IBQ, such as, "Why is the Ionic Pro so much less expensive that the Ionic Breeze by Sharper Image?" and "Is the Ionic Pro as good as the Ionic Breeze by Sharper Image?".  Barry Decl., Ex. G, IP 5767.  Two consumers have tried to return an Ionic Pro to Plaintiff for a refund.  Arney Decl. ¶ 4.  Consumer Richard Jankowitz, after watching an Ionic Pro infomercial, was confused about the source of the product because of the "similarities of the Ionic Pro and the Ionic Breeze® Quadra® infomercials as well as similarities in the appearance of the products themselves."  Jankowitz Decl. ¶ 2.  Upon ordering an Ionic Pro and realizing it was not a Sharper Image product, Mr. Jankowitz

27

United States District Court

For the Northern District of California

felt deceived.  Id. ¶ 5.

As direct evidence of consumer association of its trade dress and the Sharper Image source, Plaintiff provides twenty unsworn declarations of consumers, which it submitted to the PTO in the context of its application to register its trademark.  Barry Decl., Ex. P.  Only the spaces for name and number of years as a Sharper Image customer are completed by the declarants; each form is pre-printed to state,

> I have purchased air purifiers/air cleaners from Sharper Image, and am aware of the air purifier product that is the subject of this application.  I instantly recognize tower-shaped air cleaners with forward sloping heads and double-sided, crescent shaped, horizontal vents, as products of Sharper Image only, and not of any other company in the field.
>     It is my belief that the tower-shaped air cleaners, as described and shown above, come from Sharper Image and have the same high quality and performance as other products from Sharper Image.

Plaintiff also provides sworn statements from Sharper Image retailers with similar content.  Barry Decl., Ex. Q.

Plaintiff sought and eventually received protection for its trade dress from the Patent Office.  At one point, the PTO examining attorney rejected Plaintiff's attempt to establish acquired distinctiveness for its trade dress based on the similarity of the design to others on the market, referring Plaintiff to twenty examples of "third party use of similar product configurations for tower air purifiers and air cleaners," including

28

the accused Ionic Pro.  Rosenblatt Decl., Ex. II, SI-IP 009345.  In its Amendment and Response to the PTO, Plaintiff insisted that, of the twenty competitors identified by the examining attorney, "not one of them references a product comprised of the same design features as those found within Applicant's product."

B.  Applicable Law

A product's "trade dress" is its total image and overall appearance; it may include "features such as size, shape, color, color combinations, texture, or graphics." <u>Vision Sports, Inc. v. Melville Corp.</u>, 888 F.2d 609, 613 (9th Cir. 1989) (internal quotation and citation omitted).  Trade dress, including a product's design, may be a protected mark under the Lanham Act. <u>Wal-Mart Stores, Inc., v. Samara Bros., Inc.</u>, 529 U.S. 205, 209 (2000).  A claim for infringement of trade dress requires a plaintiff to prove three required elements:  (1) distinctiveness, (2) non-functionality and (3) likelihood of confusion.  <u>Kendall-Jackson Winery Ltd. v. E. & J. Gallo Winery</u>, 150 F.3d 1042, 1046-47 (9th Cir. 1998).  Defendants argue that Plaintiff has failed to introduce sufficient evidence to raise a triable issue of material fact on either distinctiveness or likelihood of confusion.[6]

---

[6]Defendants also criticize as overbroad Plaintiff's characterization of its trade dress because Plaintiff includes functional elements, but Defendants do not move for summary adjudication on this ground.

29

United States District Court

For the Northern District of California

C.  Analysis

1.  Distinctiveness

In an action for infringement of unregistered trade dress under § 43(a) of the Lanham Act, "a product's design is distinctive, and therefore protectible, only upon a showing of secondary meaning." Wal-Mart Stores, 529 U.S. at 216.  Whether trade dress has acquired secondary meaning is a question of fact. Lindy Pen Co., Inc., v. Bic Pen Co., 725 F.2d 1240, 1246 (9th Cir. 1984), cert. den., 469 U.S. 1188 (1985), (citation omitted).  In the Ninth Circuit, secondary meaning is defined as "the mental association by a substantial segment of consumers and potential consumers 'between the alleged mark and a single source of the product.'"  Levi Strauss & Co. v. Blue Bell, Inc., 778 F.2d 1352, 1354 (9th Cir. 1985) (quoting in part 1 J. McCarthy, §§ 15:2 at 659 and 15:11(B) at 686)).  Factors to be assessed in determining secondary meaning include whether actual purchasers associate the product design with its source, the degree and manner of the plaintiff's advertising, the length and manner of the plaintiff's use of the design and whether the plaintiff's use of the design has been exclusive.  Clamp Mfg. Co. v. Enco Mfg. Co., 870 F.2d 512, 517 (9th Cir. 1989), cert. den., 493 U.S. 872 (1989).  "Extensive use and advertising over a substantial period of time is enough to establish secondary meaning."  Id. (citing First Brands v. Fred Meyer, 809 F.2d 1378, 1383 (9th Cir. 1987)); but see Yankee Candle

30

United States District Court

For the Northern District of California

Co. v. Bridgewater Candle Co., 259 F.3d 25, 44 (1st Cir. 2001) (finding that even a plaintiff who relies on circumstantial evidence of secondary meaning must show "some evidence that consumers associate the trade dress with the source") (emphasis in original). "Proof of exact copying, without any opposing proof," may also be sufficient. Transgo, Inc., v. Ajac Transmission Parts Corp., 768 F.2d 1001 (9th Cir. 1985) (citing Audio Fidelity, Inc., v. High Fidelity Recordings, Inc., 283 F.2d 551, 557 (9th Cir. 1960).

The only direct evidence identified by Plaintiff of consumer association of the combined use of the five elements of Plaintiff's asserted trade dress with the Sharper Image source is the twenty unsworn, pre-printed consumer declarations. Even setting aside their questionable admissibility and probative value, this small collection of pre-printed declarations is not evidence of a mental association by a "substantial segment" of consumers. Furthermore, these declarations do not address the specific combination of five elements which Plaintiff claims constitutes its protected trade dress; specifically, the declarants do not mention "placement and design of the handle for the removable collector grid" or "design, placement and designation of the operational controls." Likewise, the sworn statements of Sharper Image retailers are not probative of association in the minds of the consuming public. See Yankee Candle, 259 F.3d at n.14 (noting that opinions of retailers and

31

United States District Court

For the Northern District of California

those active in the field not evidence of views of the consuming public).  Plaintiff produces no consumer surveys showing association between its trade dress and the Sharper Image brand.

Plaintiff also alleges that Defendants deliberately copied the IBQ in designing the Ionic Pro.  However, the evidence it cites refers primarily to the internal workings and performance of the IBQ, rather than to its trade dress.  The only evidence related to appearance is the "personal opinion" of Ms. Cohen that Ionic Pro was generally designed to "look and feel" similar to the IBQ; this clearly is not sufficient to show that the IBQ is distinctive.  Furthermore, as described in Section 2 below, the Ionic Pro is in fact not an exact copy.

Finally, Plaintiff points to media coverage (including its own competitors' advertisements) and its copious spending on advertising the Ionic Breeze product.  Advertising and media coverage are factors indicating distinctiveness.  However, evidence of a heavy advertising campaign is not, in itself, sufficient to allow a reasonable inference of consumer association between Plaintiff's alleged trade dress and its source.  In contrast to the product in Clamp Mfg., where the Ninth Circuit found that a plaintiff could prove distinctiveness, without showing direct evidence of consumer association, based on decades of exclusive trade dress use, Plaintiff has only sold the current version of the IBQ since 2000.  Forgan Decl. ¶ 2.  Although it is true that

32

**United States District Court**
For the Northern District of California

Plaintiff has successfully obtained two consent judgments permanently enjoining its competitors based on its allegedly distinctive trade dress, neither of those judgments indicates that the trade dress issue was subject to discovery or dispute. <u>See</u> Barry Decl. Ex. T, Consent Judgment and Permanent Injunction, <u>Sharper Image Corp. v. Bluebargain, Inc.</u>, No. CV-05-6755 AHM (C.D. Cal., September 28, 2005); Consent Judgment and Permanent Injunction, <u>Sharper Image Corp. v. Master Household, Inc.</u>, No. 03-03257-RMW (N.D. Cal., August 28, 2003). In fact, those cases, in addition to evidence of Ionic Pro sales, indicate that Plaintiff has not had exclusive use of its alleged trade dress, but has faced similar-looking competitors almost from the beginning.

For these reasons, the Court finds that Plaintiff has failed to introduce evidence that would allow a reasonable jury to conclude that its trade dress is distinctive or that a substantial segment of consumers and potential consumers has a mental association between the alleged trade dress and the Sharper Image source.

        2.   Likelihood of Confusion

Although Plaintiff's failure to show distinctiveness in itself would entitle Defendants to summary judgment on the trade dress infringement claim, the Court finds that Plaintiff has also failed to show a triable issue of material fact under the likelihood of confusion prong.

1    Eight factors are relevant to likelihood of confusion.  AMF,

2  Inc., v. Sleekcraft, 599 F.2d 341, 348-49 (9th Cir. 1979).

3  However, summary judgment on likelihood of confusion is appropriate

4  when marks are so dissimilar that there can be no likelihood of

5  confusion.  See Chesebrough-Pond's, Inc., v. Faberge, Inc., 666

6  F.2d 393, 397-98 (9th Cir. 1982) (affirming summary judgment of

7  non-infringement where marks clearly dissimilar and conclusory

8  expert affidavit unlikely to assist trier of fact).

9

10    Plaintiff's representation to the PTO that the Ionic Pro is

11 not "comprised of the same design features as" the IBQ

12 significantly undercuts Plaintiff's present claim that the products

13 share similar trade dress.  See Petro Stopping Centers, L.P. v.

14 James River Petroleum, Inc., 130 F.3d 88, 94 (4th Cir. 1997)

15 (noting that trademark applicant's representation to PTO that term

16 in mark was very dilute significantly undercut later claim in

17 infringement action that term was strong mark).

18

19    Other than attorney argument and suggestions that the Court

20 view each air purifier from a distance, Plaintiff offers no

21 evidence of similarity of trade dress.  Defendants do offer

22 evidence of some dissimilarity, based on the testimony of

23 Plaintiff's own witnesses, such as the IBQ's guitar-pick shaped

24 cross-section and angled vents.  As the initial response from the

25 PTO shows, there are many generally similar tower-type air

26 purifiers on the market.  Given the range of generally similar

27

28                              34

United States District Court

For the Northern District of California

products on the market, Plaintiff's evidence of actual confusion is de minimis, and it certainly is not probative of confusion based on trade dress.  Indeed, consumers could easily become confused based on generic similarities shared by the other nineteen tower air purifiers identified by the PTO examining attorney.

For these reasons, the Court finds that Plaintiff has failed to raise a triable issue of material fact as to whether consumers are likely to be confused by Ionic Pro's alleged use of IBQ's trade dress.  Accordingly, on the bases of both distinctiveness and likelihood of confusion, the Court grants Defendants' motion for summary adjudication of Plaintiff's claim for trade dress infringement.

IV.  Plaintiff's Unfair Competition Claim

Defendants move for summary adjudication of Plaintiff's unfair competition claim under California Business and Professions Code § 17200.  At the hearing, Plaintiff explained that its UCL claim was based only on Defendants' alleged trade dress infringement. Because the Court grants Defendants' motion with respect to the trade dress issue, it also grants Defendants' motion with respect to Plaintiff's § 17200 claim.

V.  Defendants' Counterclaims

Defendants bring counterclaims for tortious interference with economic advantage and unfair competition under California Business

35

United States District Court

For the Northern District of California

and Professions Code § 17200.   Plaintiff moves to strike those
counterclaims under California's Code of Civil Procedure § 425.16,
which provides for special motions to strike claims based on the
defendant's right of petition or free speech in connection with a
public issue, and for judgment on the pleadings under Federal Rule
of Civil Procedure 12(c) and, in the alternative, for summary
adjudication, on the grounds that the counterclaims are barred by
three absolute defenses, the litigation privilege, the competition
privilege and the First Amendment.   Defendants oppose the motion.

    A.   Factual Background

    At issue in Defendants' tort and State law counterclaims are
emails sent by Plaintiff to retailers advising them of this
lawsuit, and asking them not to carry the Ionic Pro product.   A
sample email, sent July 20, 2004 from a Sharper Image employee to
an official at the Boise Cascade/Office Max store, stated, in part,
"Sharper Images [sic] wishes to make you aware of the serious legal
consequences we expect the distributors of the Ionic Pro to suffer
because of the direct assault upon Sharper Image's Ionic Breeze
Quadra Silent Air Purifier."   Plaintiff's Request for Judicial
Notice (RJN), Ex. 4, Novak Decl., Ex A, SI-IP001199.   It warned,
"Sharper Image pursues all its legal rights against any entity or
individual which is involved in the further publication of Ionic
Pro's infringing product and fraudulent claims."   Id.   The end of
the emailed letter listed Robert Schultz, Vice-President of

36

Business and Legal Affairs for Sharper Image Corporation, and also included the name and contact information of Plaintiff's outside general counsel, e. robert wallach. Michelle Arney, a Sharper Image Rule 30(b)(6) designee, testified that the purpose of the letters was to "make sure the retailers were aware that this litigation was ongoing and to understand that ultimately they may not be able to rely on their indemnification from Ionic Pro."

Plaintiff also contacted various media outlets with its claims of infringement. A form letter for this purpose, also signed by Mr. Schultz and Mr. wallach, stated, in part,

> Sharper Image has been informed that the manufacturers and distributors of the Ionic Pro indoor air purifier have provided or will soon provide a commercial presentation for viewing on your station. We have viewed the Ionic Pro video presentation and are writing this letter to make you aware of the serious legal consequences we expect the distributors of the Ionic Pro to suffer . . . . As you would expect, Sharper Image pursues all its legal rights against any entity or individual which is involved in the further publication of Ionic Pro's infringing product and fraudulent claims. We request that you give strong consideration to rejecting this misleading advertisement instead of being a party to its further exposure.

Plaintiff's RJN, Ex. 5, SI-IP001260.

The letters referred to Plaintiff's then-pending motions in this Court for a temporary restraining order and for preliminary injunctive relief. The Court denied the motion for a preliminary injunction on September 9, 2004.

Although the text of the letters to retailers is threatening,

the evidence also shows that Plaintiff hoped for commercial

relationships with these retailers.  Plaintiff's Rule 30(b)(6)

designee Roger Bensinger testified that "what we wanted was to get

Sharper Image Ionic Breeze in" to JC Penney and other retail

stores.  Novak Decl., Ex. L, Bensinger Dep. 75:6-8.

B.  Applicability of Special Motion to Strike

California Code of Civil Procedure § 425.16(b)(1) provides,

A cause of action against a person arising from any act of
that person in furtherance of the person's right of petition
or free speech under the United States or California
Constitution in connection with a public issue shall be
subject to a special motion to strike, unless the court
determines that the plaintiff has established that there is a
probability that the plaintiff will prevail on the claim.

The California legislature recently amended this law so that it

does not apply to any cause of action brought against a person
primarily engaged in the business of selling or leasing goods
and services . . . arising from any statement or conduct by
that person if both of the following conditions exist:

(1) The statement or conduct consists of representations
of fact about that person's or a business competitor's
business operations, goods, or services, that is made for
the purpose of obtaining approval for, promoting, or
securing sales or leases of, or commercial transactions
in, the person's goods or services, or the statement or
conduct was made in the course of delivering the person's
goods or services.

(2) The intended audience is an actual or potential buyer
or customer, or a person likely to repeat the statement
to, or otherwise influence, an actual or potential buyer
or customer . . . .

Cal. Civ. Proc. § 425.17(c).  This exception was "intended to apply

United States District Court

For the Northern District of California

to commercial disputes." <u>Brill Media Co. v. TCW Group, Inc.</u>, 132 Cal. App. 4th 324, 342 (2005).  Even in the context of a commercial dispute, however, "promises made to induce settlement of a lawsuit" are not statements of fact and do not fall within the exception created by § 425.17(c).  <u>Navarro v. IHOP Prop., Inc.</u>, 134 Cal. App. 4th 834, 841 (2005).

The letters at issue contain representations of fact regarding Plaintiff's business competitor's goods.  Although those factual representations contain implicit legal threats, they are far removed from the settlement promises made in <u>Navarro</u>.  Plaintiff's own witnesses testify that one purpose of the letters was to promote Sharper Image products.  The retail recipients were clearly potential buyers of the IBQ, and the media representatives were advertisers whose business is to influence potential customers. Plaintiff's argument that Defendants' counterclaims attack protected speech activity is inapposite; § 425.17(c) specifically excludes from § 425.16's coverage speech activity that would otherwise be protected under § 425.16.  Plaintiff has shown no legal basis for its argument that § 425.16's heightened procedural protections for non-commercial speech are unconstitutional.  <u>Cf. R.A.V. v. City of St. Paul</u>, 505 U.S. 377, 381 (invalidating State statute which placed special prohibitions on certain categories of fighting words).

Accordingly, the Court concludes that § 425.17 prevents a

special motion to strike in this case.   Therefore, the Court

considers Plaintiff's motion to be a motion for judgment on the

pleadings, or, in the alternative, for summary adjudication

pursuant to Rule 56.

C.   Litigation Privilege

Defendants assert, and Plaintiff does not dispute, that they

have presented sufficient evidence to raise material issues of fact

regarding all of the elements of their State law claim for tortious

interference with economic advantage.   Therefore, the question for

the Court is whether any of Plaintiff's proposed defenses applies

as a bar.

1.   Applicable Law

Under California Civil Code § 47(b), communications made in or

related to judicial proceedings are absolutely immune from tort

liability.   The purpose of the privilege is "to afford litigants

. . . the utmost freedom of access to the courts without fear of

being harassed subsequently by derivative tort actions."   <u>Silberg</u>

<u>v. Anderson</u>, 50 Cal. 3d 205, 213 (1990).

The litigation privilege applies to any communications

(1) made in a judicial proceeding; (2) by litigants or other

participants authorized by law; (3) to achieve the objects of the

litigation; (4) that have some connection or logical relation to

the action.   <u>Silberg</u>, 50 Cal. 3d at 212; <u>Premier Communications</u>

United States District Court

For the Northern District of California

Network, Inc. v. Fuentes, 880 F.2d 1096, 1102 (9th Cir. 1987); see also Rubin v. Green, 4 Cal. 4th 1187, 1194 (1993) (noting that Silberg and other decisions emphasized the "importance of virtually unhindered access to the courts"). Once these requirements are met, § 47(b) operates as an absolute privilege. Silberg, 50 Cal. 3d at 216. Courts have applied the litigation privilege to all torts, with the exception of actions for malicious prosecution. See Edwards v. Centex, 53 Cal. App. 4th 15, 29 (1997). "Any doubt about whether the privilege applies is resolved in favor of applying it." Kashian v. Harriman, 98 Cal. App. 4th 892, 913 (2002).

The first prong of the litigation privilege test is quite broad. It covers "any publication required or permitted by law in the course of a judicial proceeding to achieve the objects of the litigation, even though the publication is made outside the courtroom and no function of the court or its officers is involved." Silberg, 50 Cal. 3d at 216.

The parties dispute the meaning of the second prong. In Silberg, the California Supreme Court stated that "republications to nonparticipants in the action are generally not privileged under section 47(2), and are thus actionable unless privileged on some other basis." 50 Cal. 3d at 219. For instance, statements "to the general public through the press" are not privileged, because the public and press have no particular connection to the proceeding.

41

United States District Court

For the Northern District of California

Susan A. v. County of Sonoma, 2 Cal. App. 4th 88, 93, 94 (1991);

but see Designing Health, Inc. v. Erasmus, 2001 U.S. Dist. LEXIS

25952, *13 (C.D. Cal., Apr. 24, 2001) (finding that press release

fell within California's litigation privilege).  However, those

non-litigants possessing a "substantial interest in the outcome of

the litigation" are "authorized participants" for purposes of the

litigation privilege.  Costa v. Superior Court, 157 Cal. App. 3d

673, 678 (1984); see also Adams v. Superior Court, 2 Cal. App. 4th

521, 529 (1992) (noting that "the privilege is not restricted to

the parties in the lawsuit but need merely be connected or related

to the proceedings") (citing Profile Structures, Inc., v. Long

Beach Bldg. Material Co., 181 Cal. App. 3d 437, 442 (1986)).

Although Defendants claim that authorized participants must have a

"formal association" with a party to the litigation, this

requirement is not supported by the case law and has not been

recognized by other district courts.  See, e.g., eCash Techs. Inc.

v. Guagliardo, 127 F. Supp. 2d 1069, 1076, 1082 (C.D. Cal. 2000)

(finding allegedly false letter sent to a third party domain name

auction service to be privileged under California law).  Defendants

attempt to distinguish eCash on the grounds that the letter there

was found not to be false or misleading; however, the court made

that finding after concluding that the litigation privilege did

apply, reasoning that "even if" the privilege didn't apply, the

tort claim would fail.  Therefore, the Court concludes that, to

42

meet the second prong of the litigation privilege, Plaintiff need only show that the recipients of its letter possessed a "substantial interest" in the litigation.

The California Supreme Court "has characterized the third prong of the foregoing [Silberg] test . . . as being 'simply part' of the fourth, the requirement that the communication be connected with, or have some logical relation to, the action." Rothman v. Jackson, 49 Cal. App. 4th 1134, 1141 (1996) (citing Silberg). The "'connection or logical relation' which a communication must bear to litigation in order for the privilege to apply, is a functional connection," i.e., the communication must "function as a necessary or useful step in the litigation process and must serve its purposes." Id. at 1146 (emphasis omitted). The test "cannot be satisfied by communications which only serve interests that happen to parallel or complement a party's interests in the litigation," including vindication in the court of public opinion. Id. at 1147. Instead, the "connection or logical relation" prong of the test "can be satisfied only by communications which function intrinsically, and apart from any consideration of the speaker's intent, to advance a litigant's case." Id. 1148.

When litigation is not yet underway, statements may still meet the requirement of "some connection or logical relation to the action" if an action is "contemplated in good faith and under serious consideration." Aronson v. Kinsella, 58 Cal. App. 4th 254,

United States District Court

For the Northern District of California

262, 266 (1997).  Thus, the privilege "has been broadly applied to demand letters and other prelitigation communications by attorneys."  Blanchard v. DIRECTV, Inc., 123 Cal. App. 4th 903, 919 (2004) (citing Rubin v. Green, 4 Cal. 4th 1187, 1194 (1993) and Knoell v. Petrovich, 76 Cal. App. 4th 164, 169 (1999)); Premier Communications Network, Inc., v. Fuentes, 880 F.2d 1096, 1102 (9th Cir. 1987).  However, "it is not the mere threat of litigation that brings the privilege into play, but rather the actual good faith contemplation of an imminent, impending resort to the judicial system for the purpose of resolving a dispute."  Eisenberg v. Alameda Newspapers, Inc., 74 Cal. App. 4th 1359, 1380 (1999) (citing Edwards v. Centex Real Estate Corp., 53 Cal. App. 4th 15, 35-36 (1997) (emphasis in original).

       2.  Litigation Privilege Analysis

    Plaintiff proffers two alternative theories by which the litigation privilege applies to its letters to retailers and the media.  First, Plaintiff argues that the recipients of the letters were "authorized participants" in its existing litigation against Defendants, because the recipients possessed a substantial interest in the outcome of the litigation.  Second, Plaintiff argues that potential litigation against the recipients was contemplated in good faith and under serious consideration, and thus the letters were protected pre-litigation communications.  Because the Court finds that the first theory provides Plaintiff with absolute

United States District Court

For the Northern District of California

immunity from suit, it need not consider the factual question of whether Plaintiff seriously contemplated suing the retailers and media outlets.[7]

Even if Plaintiff's threats against them were not serious, the retailer and media recipients possessed a substantial interest in the underlying dispute.  At that time, Plaintiff was seeking injunctive relief which, if granted, would have significantly disrupted the recipients' business arrangements with Defendants.  Furthermore, even if Plaintiff did not intend to follow through on its threats to sue the recipients for infringement, a finding by the Court that the Ionic Pro likely infringed Plaintiff's patents would have significantly increased the legal liability of the letter recipients.

In disputing whether the second prong of the litigation privilege applies here, Defendants rely on cases such as <u>Susan A.</u>, where a California court held that statements to the general public through reporters were not privileged because the press and the public at large had no connection with the criminal case being litigated.  Here, however, the statements were not broadcast to the entire media through a press release, or to the public generally, but to specific media representatives who carried advertisements

---

[7]Accordingly, the parties' various objections to evidence regarding Sharper Image's intent in sending the letters are denied as moot.

for the Ionic Pro.  Although their interest in the underlying action may not have been as great as that of Ionic Pro retailers, the media outlets faced a potential disruption if the Court had granted the injunctive relief sought by Plaintiff.  Therefore, the Court finds that the undisputed evidence shows that the recipients of the letters had a substantial interest in Plaintiff's lawsuit against Defendants.  Because none of the other prongs of the litigation privilege is in dispute, the litigation privilege applies as an absolute bar to Defendants' counterclaims.

VI.  Plaintiff's Motion for Leave to File TAC

Plaintiff moves for leave to file a TAC adding Peter Spiegel, Mehran Gabbay, Sylmark Holdings, Ltd. and Great Products, Ltd. as defendants; adding the Ionic Pro Compact as an accused product; and adding allegations of tax fraud as additional bases for Plaintiff's § 17200 unfair competition claim.  The motion was filed on November 28, 2005, and is based primarily on the testimony of Ms. Cohen, who was deposed on November 10, 2005.  Defendants oppose the motion.

A.  Factual Background

Mr. Spiegel was significantly involved in the development of the Ionic Pro.  Mr. Bess has testified that he is transferring all of his interest in the Sylmark entities to Mr. Spiegel.  Barry Decl., Ex. F, Bess Dep. 113:11-16.  According to Mr. Spiegel, an entity called Tetra Partners will soon own ninety percent of the

46

United States District Court

For the Northern District of California

1    Sylmark partnership interests.

2        According to Ms. Cohen, Sylmark Holdings, an Irish company,

3    has the same owners as the Sylmark entities, including Mr. Spiegel.

4    Cohen Dep., 96-97.  Mr. Spiegel testified that Irish company Great

5    Products, which owns the rights to Ionic Pro, received a nine

6    percent royalty on the United States license to sell the Ionic Pro

7    (later reduced to six percent).  Spiegel Dep. 325-326.

8

9        Mehran Gabbay is the registered owner of

10   www.factoryprices4U.com.  Barry Decl. ¶ 9.  Since January 1, 2005,

11   internet users logging onto Defendant Factories2U's website have

12   been directed to www.factoryprices4U.com, where the Ionic Pro

13   product is being sold.  Id. ¶ 8.  Mr. Gabbay is one of only two

14   employees of Factories2U.  Barry Decl., Ex. G, Gabbay Dep. 7.

15

16       In October, 2005, Plaintiff became aware of the commercial

17   availability of the new "Ionic Pro Compact" product.  Barry Decl.

18   ¶ 12.  Plaintiff asserts that the Ionic Pro Compact has the same

19   design, shape and features as the original Ionic Pro.

20

21       B.  Legal Standard

22       Federal Rule of Civil Procedure 15(a) provides that leave of

23   the court allowing a party to amend its pleading "shall be freely

24   given when justice so requires."  Leave to amend lies within the

25   sound discretion of the trial court, which discretion "must be

26   guided by the underlying purpose of Rule 15 to facilitate decision

27

28                                  47

on the merits, rather than on the pleadings or technicalities."
United States v. Webb, 655 F.2d 977, 979 (9th Cir. 1981) (citations
omitted).  Thus, Rule 15's policy of favoring amendments to
pleadings should be applied with "extreme liberality."  Id.; DCD
Programs, Ltd. v. Leighton, 833 F.2d 183, 186 (9th Cir. 1987)
(citations omitted).

     The Supreme Court has identified four factors relevant to
whether a motion for leave to amend should be denied: undue delay,
bad faith or dilatory motive, futility of amendment, and prejudice
to the opposing party.  Foman v. Davis, 371 U.S. 178, 182 (1962).
The Ninth Circuit holds that these factors are not of equal weight;
specifically, delay alone is insufficient ground for denying leave
to amend.  Webb, 655 F.2d at 980.  Further, the "liberality in
granting leave to amend is not dependent on whether the amendment
will add causes of action or parties."  DCD Programs, 833 F.2d at
186.  Rather, the court should consider whether the proposed
amendment would cause the opposing party undue prejudice, is sought
in bad faith, or constitutes an exercise in futility.  Id. (citing
Acri v. Int'l Ass'n of Machinists & Aerospace Workers, 781 F.2d
1393, 1398-99 (9th Cir. 1986); United States v. City of Twin Falls,
806 F.2d 862, 876 (9th Cir. 1986); Howey v. United States, 481 F.2d
1187, 1190-91 (9th Cir. 1973); Klamath-Lake Pharm. Ass'n v. Klamath
Med. Serv. Bureau, 701 F.2d 1276, 1293 (9th Cir. 1983)).

     Prejudice typically arises where the opposing party is

48

surprised with new allegations which require more discovery or will otherwise delay resolution of the case.  See, e.g., Acri, 781 F.2d at 1398-99; Guthrie v. J.C. Penney Co., 803 F.2d 202, 210 (5th Cir. 1986).  The party opposing the motion bears the burden of showing prejudice.  DCD Programs, 833 F.2d at 186; Beeck v. Aquaslide 'N' Dive Corp., 562 F.2d 537, 540 (8th Cir. 1977).

C.  Analysis

1.  Mr. Gabbay and Ionic Pro Compact

Plaintiff asserts that the Ionic Pro Compact, introduced in October, 2005, shares the design, shape and features of the original Ionic Pro and thus infringes the '494 patent and the Sharper Image trade dress.  Because the Court grants Defendants' motion for summary adjudication of the design patent and trade dress claims, the Court also denies on grounds of futility the motion to add the Ionic Pro Compact as an accused product.

With respect to Mr. Gabbay, there are no claims remaining in this case which are relevant to his activities after January 1, 2005, when Factories2U ceased directly selling the accused products.  Furthermore, Plaintiff has known about Mr. Gabbay's additional website since January, 2005, and offers no grounds to justify its delay in adding him as a defendant.  Therefore, the Court denies leave to add Mr. Gabbay.

Similarly, with respect to Sylmark Holdings, Ltd., and Great

United States District Court

For the Northern District of California

Products, Ltd., Plaintiff has failed to show that these entities were involved or intertwined in Defendants' activities during the specific time frame for which the Court has found that a triable claim for infringement exists. Instead, it appears that Plaintiff wishes to add these proposed defendants for purposes of its additional § 17200 claim. Because, as described below, the Court denies Plaintiff leave to add claims based on the allegedly illegal Sylmark corporate structure, leave to add Sylmark Holdings, Ltd., and Great Products, Ltd. is also denied.

2. Mr. Spiegel

On the other hand, Plaintiff has shown evidence that Mr. Spiegel was personally and actively involved in selling the first-generation Ionic Pro after the '484 patent issued. Defendants do not identify any prejudice that will flow from adding Mr. Spiegel. Although Plaintiff was aware of Mr. Spiegel's involvement since at least July, 2004, when he submitted a declaration describing his role, Plaintiff has recent cause to believe that Mr. Spiegel is needed as a named defendant in order to satisfy any judgment in Plaintiff's favor. Therefore, the Court grants Plaintiff's motion to add Mr. Spiegel.

3. Additional Claims

The Court denies Plaintiff leave to amend to add its proposed additional claims relating to international tax fraud. These

50

proposed additions introduce an entirely new theory of liability and could substantially delay this action.  Even assuming, as Plaintiff argues, that all of the relevant information is within Defendants' possession, another round of case-dispositive motions would be appropriate, and the May 8, 2006 trial date would be lost. Such a disruption to the schedule would cause undue prejudice to Defendants.  Accordingly, Plaintiff's motion to add these claims is denied.

CONCLUSION

For the foregoing reasons, the Court GRANTS in part Defendants' motion for summary adjudication (Docket No. 670) of Plaintiff's claims of infringement of the '484 utility patent based on the second-generation Ionic Pro product; infringement of the '494 design patent; infringement of Plaintiff's trade dress; and unfair competition under California Business and Professions Code § 17200.  The Court also grants summary adjudication in Defendants' favor with respect to Plaintiff's remaining claims against Mr. Bess and the retail Defendants Target, Qwik Cook d/b/a Home Trends and Factories2U.  Otherwise, the Court denies Defendants' motion for summary adjudication.

The Court GRANTS Plaintiff's motion for summary adjudication of Defendants' tort and State law counterclaims against it (Docket Nos. 520 and 625).  Otherwise, the Court denies Plaintiff's motion for summary adjudication.

51

United States District Court

For the Northern District of California

1    The parties' motions to strike based on evidentiary objections

2  are denied (Dockets No. 661 and 677), as is Plaintiff's ex parte

3  application requesting that Defendants withdraw their reply brief

4  (Docket No. 701).

5    The Court GRANTS in part Plaintiff's motion for leave to file

6  a TAC (Docket No. 467).  Plaintiff may add Mr. Spiegel as a

7  defendant.  Otherwise, Plaintiff's motion for leave is denied.  The

8  TAC must be filed within three days of the date of this order.  Mr.

9  Spiegel may stand on the Answer already filed.

10    Remaining for trial are Defendants' invalidity counterclaims

11  and Plaintiff's claim against Mr. Spiegel, Ionic Pro, LLC, Ideal

12  Products, Sylmark and Sylmark, LLC for inducing infringement of its

13  utility patent.

14

15

16    IT IS SO ORDERED.

17  Dated:  3/29/06

18  

19  _____

20  CLAUDIA WILKEN
    United States District Judge